AO 93 (Rev. 11/13) Search and Seizure Warrant (USAO CDCA Rev. 04/17)

# UNITED STATES DISTRICT COURT

ORIGINAL

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of ) | |
| ) | |
| **Digital Device (the "Subject Device") which is in the custody** ) | Case No.    8:19-MJ-00679 |
| **of the United States Postal Inspection Service, in Anaheim,** ) | |
| **CA, as described more fully in Attachment A:** ) | |
| **One Apple iPhone** ) | |

## SEARCH AND SEIZURE WARRANT

To:    Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Central _____ District of _____ California _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

Such affidavit(s) or testimony are incorporated herein by reference and attached hereto.

**YOU ARE COMMANDED** to execute this warrant on or before    14 days from the date of its
issuance    *(not to exceed 14 days)*

☒ in the daytime 6:00 a.m. to 10:00 p.m.    ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to    the U.S. Magistrate Judge on duty at the time of the
return through a filing with the Clerk's Office
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____

Date and time issued:    *9/5/2019 at 10:35 am* _____
Judge's signature

City and state:    Santa Ana, California    HON. DOUGLAS F. McCORMICK, US Magistrate Judge
*Printed name and title*

AUSA: Gina Kong (x3576)

AO 93 (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>8:19-MJ-00679 | Date and time warrant executed:<br>09-06-2019 | Copy of warrant and inventory left with:<br>N/A |
| Inventory made in the presence of : | | |

Inventory of the property taken and name of any person(s) seized:

Device (Attachment A) was not
Searched because it was not
accessible to forensic lab
personnel due to being locked/
powered off/no passcode.

| Certification |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: 1-16-2020

*Executing officer's signature*

L.A. Hazan, US Postal Inspector
*Printed name and title*

**ATTACHMENT A**

<u>PROPERTY TO BE SEARCHED</u>

The following digital device (the "SUBJECT DEVICE"), seized from Christopher GRIER's person on July 26, 2019, and currently maintained in the custody of the United States Postal Inspection Service in Anaheim, CA:

>       One (1) Apple iPhone
>       (no further identifiers or markings)
>       ("SUBJECT DEVICE")

**ATTACHMENT B**

**I.    ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 641 (Theft of Government Property), 1028A (Identity Theft), 493 (Fraudulent Checks) and 371 (Conspiracy), (the "Subject Offenses"), namely:

a.    Data, records, documents, photos, videos, or information (including electronic mail and messages) pertaining to obtaining, possessing, using, producing/manufacturing, printing, buying, or selling identification profiles or documents and/or checks or checking account information;

b.    All documents, files, and records relating to the legitimacy, authenticity, and/or communications relating to checks and/or identification profiles or documents;

c.    Any documents or records relating to any bank accounts, credit card accounts, or other financial accounts or records;

d.    Records, documents, customer lists, photos, videos, communications, or materials relating to United States acquiring, selling, buying, or trading postage stamps;

e.    Contents of any calendar or date book stored on any of the digital devices;

f.    Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations;

g.   Records, documents, programs, applications or
materials, or evidence of the absence of same, sufficient to
show address book information, including all stored or saved
telephone numbers;

h.   Records, documents, programs, applications and
materials, or evidence of the absence of same, sufficient to
show call log information, including all telephone numbers
dialed from any of the digital devices and all telephone numbers
accessed through any push-to-talk functions, as well as all
received or missed incoming calls;

i.   Records, documents, programs, applications or
materials, or evidence of the absence of same, sufficient to
show SMS text, email communications or other text or written
communications sent to or received from any of the digital
devices and which relate to the above-named violations;

j.   Records, documents, programs, applications or
materials, or evidence of the absence of same, sufficient to
show instant and social media messages (such as Facebook,
Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp),
SMS text, email communications, or other text or written
communications sent to or received from any digital device and
which relate to the above-named violations;

k.   Audio recordings, pictures, video recordings, or
still captured images of checks, identifications, personal
identifying information, United States postage stamps, or
relating to the possession or distribution of postage stamps or
of the proceeds of the above-described offenses; and

l.   Any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense/s, and forensic copies thereof.

m.   With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.   passwords, encryption keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and

manuals, that may be necessary to access the device or to conduct a forensic examination of it;

        viii.    records of or information about Internet Protocol addresses used by the device;

        ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

    2.  As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

## II.  **SEARCH PROCEDURE FOR DIGITAL DEVICE**

    3.  In searching the SUBJECT DEVICE (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

        a.  Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any SUBJECT DEVICE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

        b.  The search team will, in its discretion, either search each SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.   The search team shall complete the search of the SUBJECT DEVICE as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant.  The government will not search the digital devices beyond this 120-day period without obtaining an extension of time order from the Court.

d.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT DEVICE and any data thereon falls within the scope of the items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

e.   If the search team, while searching a SUBJECT DEVICE, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized,

the team shall immediately discontinue its search of that
SUBJECT DEVICE pending further order of the Court and shall make
and retain notes detailing how the contraband or other evidence
of a crime was encountered, including how it was immediately
apparent contraband or evidence of a crime.

      f.   If the search determines that a SUBJECT DEVICE
does not contain any data falling within the list of items to be
seized, the government will, as soon as is practicable, return
the SUBJECT DEVICE and delete or destroy all forensic copies
thereof.

      g.   If the search determines that a SUBJECT DEVICE
does contain data falling within the list of items to be seized,
the government may make and retain copies of such data, and may
access such data at any time.

      h.   If the search determines that the SUBJECT DEVICE
is (1) itself an item to be seized and/or (2) contains data
falling within the list of other items to be seized, the
government may retain the digital device and any forensic copies
of the digital device, but may not access data falling outside
the scope of the other items to be seized (after the time for
searching the device has expired) absent further court order.

      i.   The government may also retain a SUBJECT DEVICE
if the government, prior to the end of the search period,
obtains an order from the Court authorizing retention of the
device (or while an application for such an order is pending),
including in circumstances where the government has not been

able to fully search a device because the device or files
contained therein is/are encrypted.

       j.   After the completion of the search of the SUBJECT
DEVICE, the government shall not access digital data falling
outside the scope of the items to be seized absent further order
of the Court.

     4.   This warrant authorizes a review of electronic storage
media seized, electronically stored information, communications,
other records and information seized, copied or disclosed
pursuant to this warrant in order to locate evidence, fruits,
and instrumentalities described in this warrant.  The review of
this electronic data may be conducted by any government
personnel assisting in the investigation, who may include, in
addition to law enforcement officers and agents, attorneys for
the government, attorney support staff, and technical experts.
Pursuant to this warrant, the investigating agency may deliver a
complete copy of the seized, copied, or disclosed electronic
data to the custody and control of attorneys for the government
and their support staff for their independent review.

     5.   BIOMETRIC UNLOCK: During the execution of this search
warrant, law enforcement is permitted to (1) depress TARGET's
thumb- and/or fingers onto the fingerprint sensor of the SUBJECT
DEVICE (only if the device has such a sensor), and direct which
specific finger(s) and/or thumb(s) shall be depressed; and (2)
hold the device in front of TARGET's face with his or her eyes
open to activate the facial-, iris-, or retina-recognition
feature, in order to gain access to the contents of any such

device.  In depressing a person's thumb or finger onto a device
and in holding a device in front of a person's face, law
enforcement may not use excessive force, as defined in Graham v.
Connor, 490 U.S. 386 (1989); specifically, law enforcement may
use no more than objectively reasonable force in light of the
facts and circumstances confronting them.

6.   The special procedures relating to digital devices
found in this warrant govern only the search of digital devices
pursuant to the authority conferred by this warrant and do not
apply to any search of digital devices pursuant to any other
court order.

## 1.   AFFIDAVIT

I, Lori Hazan, being duly sworn, declare and state as follows:

### I.   PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of an application for a warrant to search the following digital device (the "SUBJECT DEVICE"), which is in the custody of the United States Postal Inspection Service, in Anaheim, California, as described more fully in Attachment A:

      a.    One (1) Apple iPhone (no further
           markings/identifiers)
          ("SUBJECT DEVICE")

2.    The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. §§ 641 (Theft of Government Property), 1028A (Identity Theft), 493 (Fraudulent Checks), and 371 (Conspiracy), (collectively, the "Subject Offenses"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. <u>BACKGROUND OF AFFIANT</u>

4.    I am a Postal Inspector employed by the United States Postal Inspection Service (USPIS) in San Diego, California.  I have been employed as a Postal Inspector since July 2005 and am currently assigned to investigate various schemes to defraud the United States Postal Service (USPS), including counterfeit stamps, theft of government property, and counterfeit checks.  I have completed Basic Inspector Training, Revenue Fraud Training, Mail Fraud Training, Identity Theft Training, and several other training courses related to my duties as a Postal Inspector.

5.    Since October 2008, I have been assigned to the San Diego Revenue Fraud/Asset Protection team and am primarily responsible for conducting investigations relating to individuals and businesses defrauding the USPS of revenue, goods, and/or services.  I know the USPS is a government business that sells products and services to generate revenue. Based on my training, experience, and discussions with other Postal Inspectors, I am familiar with the operations of the USPS and have conducted numerous investigations concerning schemes that defraud the USPS of the lawful payment for postage, products, and/or services, such as check fraud, credit card fraud, theft of government property (USPS goods and services), and stolen, counterfeit, and/or altered postage.  I am considered a subject matter expert for bad check investigations and have testified as such in federal court.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

6.   On July 26, 2019, Riverside Sheriff's Deputies in Sun City, California, arrested Christopher GRIER ("GRIER") at the Sun City Post Office while attempting to pass a counterfeit check in another's name for $8,250 to steal and purloin postage stamps from the USPS.  The SUBJECT DEVICE was on GRIER's person at the time of arrest.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

7.   Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

On July 26, 2019, I received notification from the Lake Elsinore Post Office that a customer tried to purchase 150 rolls (100 stamps/roll) of stamps valued at $8,250 with a check and wearing a "work" identification on a lanyard around his neck.  I reviewed the check image they provided and it was a "business" check with a pre-typed pay to "POSTMASTER" and pre-typed date. The check presented appeared to be in the name of "RSVPeople/Abdullah YHMA Alawadhi."  Based on the appearance of the check and requested amount of stamps, I believed this individual was a check "runner" for an individual I am currently investigating, Kaleb Matias WIEWANDT ("WIEWANDT")[1].  WIEWANDT's checks are almost always pre-typed.  The check was for $8,250.

---

[1] WIEWANDT is an escaped federal fugitive who was serving time for a scheme that involved defrauding the USPS of over $1.1 million using bad checks to purchase postage stamps (District of Arizona case CR15-00633).  Since his escape in September 2018, it is believed WIEWANDT is operating a similar scheme resulting in losses over $300,000.00 to the USPS.

This amount was similar to other returned checks I believed were associated to individuals associated to WIEWANDT.  Based on my training and experience, I know that businesses typically do not write checks for large amounts of postage at the retail counter and that they usually use a mailing service or permit for a discounted rate.  Therefore, the large quantity of stamps, use of a pre-typed business check, and lanyard with "work" ID matches WIEWANDT's activity.  WIEWANDT has recently passed several checks with similar activities in Orange County, including Santa Ana, Irvine, and Mission Viejo.  During the course of my investigation of WIEWANDT, I reviewed information in the Department of Justice database and observed "crash" as a moniker for WIEWANDT.  Based on my belief that this was likely a check "runner" for WIEWANDT, I instructed surrounding Post Offices to call the police and delay the customer if he was seen at another Post Office.

8.      On July 26, 2019, at approximately 4:30 p.m., I was notified by the Sun City Post Office that the same individual was in the Post Office attempting to purchase stamps with a check.  The check was in the name of "RSVPeople/Abdullah YHMA Alawadhi" for $8,250.  I asked USPS staff to call the police.  Riverside County Deputies responded and detained the individual, later identified as GRIER by fingerprints.  GRIER was identified by fingerprints because he refused to identify himself to police and was in possession of California identification XXXX8158 in the name of Abdullah YHMA Alawadhi and the SUBJECT DEVICE.  I have conducted a search for California identification XXXX8158

and found it assigned to Abdullah YHMA Alawadhi.  The current, valid identification for Alawadhi appears to have been issued on May 2, 2019, which is different from the March 1, 2017 issue date on the identification in GRIER's possession.

9.   I spoke with Riverside Sheriffs who told me that they located a vehicle associated with GRIER parked outside the Post Office.  The vehicle was not occupied and had expired registration, so it was impounded.  A vehicle inventory search was conducted by Riverside Sheriffs where additional checks as well as identifications and access devices not in GRIER's name were located.  The arresting deputy told me that he was in possession of the SUBJECT DEVICE, which he placed in airplane mode and powered off.

10.   I responded to the Riverside County jail in Riverside, California, to interview GRIER.  Prior to the interview, I reviewed GRIER's property, a wallet and the SUBJECT DEVICE, that were taken to jail with him.  In GRIER's wallet, I found a California Driver's License in the name of Logan Andrew Rinkovasky, access devices not in GRIER's name, and a $100 currency note that lacked legitimate currency security features when examined with an ultraviolet light.  Additionally, there were two (2) business cards in the name of "Abdullah Alawadhi/RSVPeople."

11.   I interviewed GRIER after he was read his Miranda Rights and signed that he understood them and agreed to speak to me without an attorney.  In summary, GRIER stated he answered a "Craigslist" or "Let Go" employment ad and was working for

someone calling Post Offices to ask about stamps.  GRIER stated

he was doing this for a few weeks and making about $100 a day

just to call Post Offices and find out how many stamps they had

to purchase.  GRIER stated he was working for "Crash" and did

not know the actual name of the person he was working for.

GRIER described "Crash" as a clean-cut white male with slicked

back hair.  This matches the description of WIEWANDT, who has a

documented moniker of "Crash[2]"; however, GRIER did not believe

"Crash" was "sleeved" with tattoos, as WIEWANDT appears to be in

recent surveillance video.  GRIER stated this was the first day

he presented checks to Post Offices and had met "Crash" in

Anaheim earlier in the day to receive the checks.  GRIER stated

he likes to "car fish" and possess a couple identifications that

look like him, but are not him.  GRIER stated he would

communicate with "Crash" using the Craigslist generated email to

his email of alawadhi@yahoo.com.  GRIER said the communications

with "Crash" would be on the SUBJECT DEVICE, but declined to

unlock the phone during the interview to show me the

communications.

       12.  Following the interview, GRIER was booked into

Riverside County jail for his warrant out of Orange County.

### V.    TRAINING AND EXPERIENCE REGARDING CHECK INVESTIGATIONS/THEFT OF POSTAGE STAMPS

       13.  Based on my training and experience and information

obtained from other Postal Inspectors who investigate

counterfeit postage stamps, I know the following:

---

[2] I reviewed the Department of Justice/Bureau of Prisons
records, which showed "Crash" as an alias for WIEWANDT.

   a. Postage stamps are an attractive commodity to those engaged in fraudulent activity.  Postage stamps are easily sold or traded for cash.  Postage stamps are also used as currency in the prison system.

   b. Checks and other financial instruments can be easily produced using digital devices such as computers, laptops, and/or printing devices.  Individuals engaged in check fraud will also create business cards, business documents on "company" letterhead, employee identifications, and/or wear certain attire to match their "business" purpose (e.g., medical uniforms) to further their scheme.

   c. Individuals using counterfeit or fraudulent financial instruments often leave the Post Office when challenged or told their payment would have to be verified.  Customers with legitimate forms of payment generally do not travel from Post Office to Post Office on the same day to buy something they could have purchased at a single Post Office.  Frequently, these individuals travel in vehicles and use digital devices to navigate to multiple Post Offices.

   d. Individuals engaged in check fraud often use stolen or counterfeit identifications in the names of others in order to conceal their true identity and avoid prosecution.  It has been my experience in prior investigations that those engaged in check fraud will seek or "hire" individuals who match the physical description on a lost or stolen identification they acquired.  Likewise, I am aware of individuals placing their own photo over a lost or stolen identification so that when they

present it in a wallet, the alteration cannot be detected unless
the merchant requests the identification be removed and
examined.  Often times, the victim does not realize their lost
or stolen identification is being used to pass fraudulent
checks.

     e.  Based on my training and experience, I know that
individuals who participate in fraudulent check schemes often
have co-conspirators, and often maintain and store telephone
numbers, email addresses, and other contact information and
communications involving their co-conspirators in order to
conduct their business.  Oftentimes, they do so on their digital
devices.  Suspects often use their digital devices to
communicate with co-conspirators by phone, text, email, and
social media, including sending photos.

### VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

14.  As used herein, the term "digital device" includes the
SUBJECT DEVICE.

15.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

     a.  Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet.  Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur

after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

          b.   Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

          c.   The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

          d.   Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain

"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

16.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it is not always possible to search devices for data
during a search of the premises for a number of reasons,
including the following:

e.  Digital data are particularly vulnerable to
inadvertent or intentional modification or destruction.  Thus,
often a controlled environment with specially trained personnel
may be necessary to maintain the integrity of and to conduct a
complete and accurate analysis of data on digital devices, which
may take substantial time, particularly as to the categories of
electronic evidence referenced above.

f.  Digital devices capable of storing multiple
gigabytes are now commonplace.  As an example of the amount of
data this equates to, one gigabyte can store close to 19,000
average file size (300kb) Word documents, or 614 photos with an
average size of 1.5MB.

17.  The search warrant requests authorization to use the
biometric unlock features of a device, based on the following,
which I know from my training, experience, and review of
publicly available materials:

g.  Users may enable a biometric unlock function on
some digital devices.  To use this function, a user generally

displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

h.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

i.   The person who is in possession of a device or has the device among his or her belongings is likely a user of the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress TARGET's thumb- and/or fingers on the device; and (2) hold the device in front of TARGET's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

18.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VII. <u>CONCLUSION</u>

19.   For all of the reasons described above, there is probable cause to believe that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICE described in Attachment A.

/s/
_____
Lori Hazan, Postal Inspector
United States Postal
Inspection Service

Subscribed to and sworn before me this  5th  day of September, 2019.

**DOUGLAS F. McCORMICK**
_____
UNITED STATES MAGISTRATE JUDGE
HONORABLE DOUGLAS F. MCCORMICK